**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STACY WOODALL, | * | |
| Plaintiff | * | |
| v. | * | Civil Case No. 8:24-cv-01236-AAQ |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

## MEMORANDUM OPINION AND ORDER

This is a case arising out of the Government's alleged mismanagement of a patient's hand infection, resulting in her losing function of her right thumb. Pending before the Court is Plaintiff Stacy Woodall's Motion to Exclude Defense Expert Paul M. Apostolo's Independent Medical Examination ("IME") Report and to strike him from testifying in this case. ECF No. 44. For the reasons discussed below, the Court shall grant, in part, and deny, in part, Ms. Woodall's Motion to Exclude Dr. Apostolo's Rule 35 Report. ECF No. 44. The Court denies Ms. Woodall's Motion to Strike Dr. Apostolo as an expert, but places limitations on the scope of his future testimony in this case. *Id.*

## BACKGROUND

On April 26, 2024, Plaintiff Stacy Woodall filed a Complaint with this Court against the United States of America (the "United States").[1] ECF No. 1. Ms. Woodall, a resident of Joint Base Andrews in Maryland, alleges that the United States was negligent in treating an infection she developed after surgery on her right thumb at a government-owned medical facility. *See id.* at ¶¶ 4, 5, 10, 33. During the course of discovery, the United States asked Ms.

[1] Ms. Woodall initially also sued Dr. April Ligato in her individual capacity but later stipulated to voluntarily dismissing her as a Defendant pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii) and 28 U.S.C. § 2679(b)(1). ECF No. 14; *see* ECF No. 16.

Woodall to submit to an Independent Medical Examination ("IME") with Dr. Apostolo—the United States' standard of care, causation, and damages expert. ECF No. 44, at 7; ECF No. 45-1, at 1-2. Ms. Woodall agreed without seeking an order from this Court to set parameters under Federal Rule of Civil Procedure 35. ECF No. 44, at 7, n.4; ECF No. 45-1, at 1-2.

Ms. Woodall presented herself to Dr. Paul Apostolo's office on July 25, 2025, for the IME. ECF No. 44-2, at 1. A paralegal from her counsel's firm accompanied her. *Id.* at 2. Dr. Apostolo denied the paralegal entry into the examination room to ensure that Ms. Woodall felt comfortable answering sensitive questions during the examination. *Id.* The paralegal was told to "make himself comfortable" in the waiting room, where he remained for the duration of the examination. *Id.* Dr. Apostolo explained to Ms. Woodall that she was in his office for the sole purpose of his "orthopedic surgical evaluation." *Id.* at 1. He explained that Ms. Woodall's "failure to answer any question completely and truthfully along with all complete and truthful answers would be reported." *Id.*

As part of the IME, Dr. Apostolo reviewed Ms. Woodall's medical records, the depositions of Ms. Woodall, Dr. Ligato, Dr. Tintle, Physician's Assistant ("PA") Gothard, and PA Natapraya; conducted an interview; and performed a medical examination on her hand. *Id.* at 2, 8-9. Dr. Apostolo memorialized his findings in a fourteen-page report. *See* ECF No. 44-2. All quotes in the report were "read back to Ms. Woodall" and she edited her statements on several occasions for clarity and accuracy. *Id.* at 2. Of the fourteen pages, Dr. Apostolo spent approximately two pages on background, six on Ms. Woodall's medical records and interview, one on the medical examination, and five on his conclusion. *See* ECF No. 44-2.

Dr. Apostolo started by noting Ms. Woodall's past medical history, including her type 2 diabetes, Lap-Band surgery, postoperative herniation, anxiety, depression, attention deficit disorder, drug and alcohol use, rib and wrist fractures due to a motor vehicle accident, C-section, septoplasty, and lipoma excised from her neck. *Id.* at 3. Dr. Apostolo reported that

Ms. Woodall's hobbies include walking her dogs, Pilates, and playing pickle ball. *Id.* He also discussed her work history. *Id.* at 4.

Dr. Apostolo reviewed each hospital visit in detail with Ms. Woodall. Regarding the July 6 and July 9 visits, he noted that "PA Gothard explained the potentially devastating effects of a post-operative infection" and "even went so far as to schedule a follow up . . . despite the notable improvement already documented on July 6." *Id.* at 6. In asking Ms. Woodall about her visit on July 23, he noted that she asked Dr. Ligato's permission to travel and that she "obviously would not have gone unless [Dr. Ligato] thought it was okay." *Id.* at 6-7.

After examining Ms. Woodall's hand, Dr. Apostolo reported that she had "well-healed scars consistent with the described surgery," a full range of motion in her middle, ring, and little fingers with no pain, and "no swelling or fullness of any of" her fingers. *Id.* at 8-9. Dr. Apostolo found that Ms. Woodall's hand had "intact active flexion" and "excellent thenar control of the thumb metacarpal," normally functioning "first dorsal compartment, EPL, FCR, and radial extensor tendons," no hypersensitivity to light touch, normal "sweat pattern and temperature regulation of all" her fingers, including her thumb, normal joint skin creases, and no "degradation of strength or associate pain with repetitive testing." *Id.* at 9. Dr. Apostolo also reported that there was "mild tenderness to percussion of the volar distal forearm region over the scar but not to the thumb," and that her grip strength was "22 kg on the right side with minimal effort and no use of the thumb compared to 28 kg on the left side." *Id.*

In recounting his interview of her, Dr. Apostolo repeatedly assessed Ms. Woodall's veracity. *See* ECF No. 44-2. For example, he recalled that after reading her statement back more than once, Ms. Woodall could not remember the precise location of the pain in her thumb. *Id.* at 4. He noted that Ms. Woodall could not recall how she was able to see Dr. Ligato the same day she saw her primary care provider. *Id.* He also pointed out that Ms. Woodall was under the impression that Dr. Ligato did not perform a post-operative procedure on her open

wound and instead prescribed her an antibiotic. *Id.* at 5. Ms. Woodall explained that Dr. Ligato "'did not perform an incision. She mashed on it to get the pus to come out,'" despite "a reference to, 'a small I&D'" in the medical records. *Id.* Dr. Apostolo also noted that Ms. Woodall received a referral for therapy despite her stating that she never received one. *Id.* at 6. Additionally, Dr. Apostolo recounted that Ms. Woodall did not recall speaking with Dr. Ligato between the July 23rd and July 29th visit. *Id.* at 7. Finally, Dr. Apostolo then asked Ms. Woodall "why she had limited her complaint to Dr. Ligato, particularly, excluding the providers in Nebraska." *Id.* at 9.

Dr. Apostolo concluded that Ms. Woodall's hand showed "[e]xcellent results following treatment for right thumb acute purulent tenosynovitis with minimal residual objective impairment or claimed disability" and that he could not find "a single instance of the care and advice provided to Ms. Woodall by any personnel associated with the United States of America, including Dr. Ligato, that did not make a reasonable decision based upon the 'generally accepted practice standards at the time, place and in the context of the care delivered.'" *Id.* at 10. Dr. Apostolo opined that nothing that Dr. Ligato or the United States did "intentionally, with malfeasance, or with negligence caused or contributed to Ms. Woodall's two infections." *Id.*

Dr. Apostolo summarized Ms. Woodall's legal argument as being a "criticism regard[ing] the failure to act, rather than any action that was performed." *Id.* Accordingly, he addressed "several areas of care that have been questioned" by Ms. Woodall's counsel in the deposition transcripts. *Id.* He found that it was appropriate for Dr. Ligato to discard the plastic bag that contained purulence that Ms. Woodall provided. *Id.* at 11. He concluded that Dr. Ligato acted reasonably by not culturing the wound three weeks after surgery and found her prescription of an antibiotic "laudable." *Id.* Likewise, he found that Dr. Ligato's "failure to explore for, or additionally treat, the unknown retained nylon suture material" reasonable. *Id.*

Dr. Apostolo did not limit his conclusions to only standard of care observations, continuing:

> The true nature of the discussions between Ms. Woodall and Dr. Ligato on July 23, 2021 may never be known but it is reasonable to conclude that Dr. Ligato was appropriately deferential to Ms. Woodall's dying friend and any stated urgency of her trip to Nebraska . . . . Ms. Woodall impresses me as a woman who knows how to get attention and treatment whenever, and wherever, she wants it. She is obviously not someone easily distracted or displaced from a personal mission. It was well within the standard of care for Dr. Ligato to defer to Ms. Woodall's self assessment regarding the urgency of her needs and complaints on July 23 and furthermore inappropriate to retrospectively criticize Dr. Ligato for not foreseeing a future event or change of circumstance that was not evident for at least another four days or to require Dr. Ligato to somehow dissuade Ms. Woodall from making her trip based upon the information available at that time.

*Id.* at 12. Additionally, Dr. Apostolo questioned Ms. Woodall's decision to seek medical care only once between July 27 and August 4, concluding that "she was under significant stress" and "seems to have sublimated her memory to the realm of poor recollection." *Id.* at 13.

Dr. Apostolo praised Dr. Ligato's work, stating that she provided "excellent care that dramatically mitigated the possible additional consequences of [Ms. Woodall's] infection," *id.*, that Ms. Woodall "owes a debt of gratitude to Dr. Ligato for arranging immediate transfer and care on August 4," *id.*, and that "this case is not demonstrably indicative of any malpractice action or inaction by Dr. Ligato and/or the United States of America," *id.* at 14.

On January 30, 2026, Ms. Woodall filed a Motion to Exclude Dr. Apostolo's IME Report and to Strike Him From Testifying In This Matter. ECF No. 44. The United States filed an Opposition on February 14, 2026, ECF No. 45, and Ms. Woodall filed her Reply on February 24, 2026, ECF No. 49. The Court held a Status Conference in the case, addressing the pending Motion on April 17, 2026. ECF No. 53.

## STANDARD OF REVIEW

A court can strike a defense expert if it finds the expert's testimony unreliable or irrelevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); Fed. R. Evid. 702 (governing the admissibility of expert testimony). Relevant to this inquiry is whether the expert "will be testifying about matters that grow 'naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for purposes of testifying,' whether 'the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion,'" or whether "the expert has adequately accounted for obvious alternative explanations." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 774 (D. Md. 2022) (citation omitted). The inquiry is flexible and courts choose which factors to weigh according to the specific facts of the case. *Johnson v. Baltimore Police Dep't*, 608 F. Supp. 3d 227, 238 (D. Md. 2022).

District courts enjoy "substantial discretion in managing discovery." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995). Accordingly, this Court possesses inherent authority to impose sanctions for "discovery abuses." *Mey v. Phillips*, 71 F.4th 203, 217 (4th Cir. 2023); *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 375 (4th Cir. 2013) ("[A] court acting under its inherent authority may impose sanctions for any 'conduct utterly inconsistent with the orderly administration of justice.'" (quoting *United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986))).

## ANALYSIS

Ms. Woodall argues that Dr. Apostolo's IME was not an objective medical examination, but rather an "ex-parte quasi-deposition," in violation of both Federal Rule of Civil Procedure 35 and Maryland Rule of Professional Conduct 4.2. ECF No. 44, at 12-16. Ms. Woodall argues that the only way to cure this violation is to exclude Dr. Apostolo's report in its entirety and strike him from acting as Defendant's IME physician and standard of care,

causation, and damages expert in this matter. *Id.* at 1, 18-21. The United States disagrees, arguing that Dr. Apostolo's IME was permissible under the federal rules and that being a defense expert does not disqualify him from conducting an IME in the same case.[2] ECF No. 45 at 4. The United States argues that even if the Court finds that the IME exceeded what the federal rules allow, the appropriate remedy is to allow Ms. Woodall to depose or cross-examine Dr. Apostolo, or to exclude only parts of the report that the Court deems inappropriate. *Id.* at 10-11.

Dr. Apostolo's report can be segregated to exclude only the parts that exceed the scope of Rule 35. However, because no other remedy can "place [Ms. Woodall] in the same position [she] would have been in" had the unauthorized questioning never occurred, *Commonwealth v. Louhisdon*, No. CIV.A. 01-201-B, 2001 WL 360047, at *4 (Mass. Super. Ct. Mar. 29, 2001), the Court will exercise its inherent authority to limit Dr. Apostolo's future testimony in this case to what remains of his IME report after this Court's redactions.

**I. Dr. Apostolo's Questioning Exceeded the Scope of Federal Rule of Civil Procedure 35.**

Under Federal Rule of Civil Procedure 35(a), a court may order the examination of a party where there is good cause for the examination and the party's physical or mental condition is in controversy. Fed. R. Civ. P. 35(a); *see, e.g., Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). The Fourth Circuit has explained that "the invasion of [an] individual's privacy by a physical or mental examination" under Rule 35 "is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962). Parties, upon agreement,

---

[2] Defendants also argue that "Plaintiff was not entitled to have a third-party intrude upon the IME," referring to the paralegal who initially accompanied Ms. Woodall to the examination. ECF No. 45, at 4; ECF No. 44-2, at 2. It is not necessary for the Court to address this argument since Ms. Woodall does not allege that she was entitled to have a third party at her IME and the paralegal was ultimately not allowed in the examination room. *See* ECF No. 44; ECF No. 44-2, at 2.

can also arrange for independent physical or mental examinations without a court order. *See, e.g., Chastain v. Evennou*, 35 F.R.D. 350, 353 (D. Utah 1964).

Here, the parties agreed to an IME without direction from this Court. ECF No. 44, at 7, n.4. Now, after the fact, Ms. Woodall argues that Dr. Apostolo's interview of her and his subsequent conclusions constituted an "off-the record cross examination about liability, causation and litigation strategy," which she argues is squarely outside the bounds of a proper Rule 35 examination. *Id.* at 12-13. The United States argues that Rule 35's text only requires "the examiner to be 'suitably licensed or certified,'" and is silent as to whether the examiner can provide opinions on liability or causation. ECF No. 45, at 5. The United States contends that if Ms. Woodall wanted to place certain restrictions on the scope of the IME, she should have petitioned this Court prior to the examination. *Id.* at 8-9.

The United States is correct that petitioning the Court before the IME is the typical course of action and is probably the best practice. This Court routinely orders parties to submit to an IME under Rule 35 with appropriate restrictions as requested. *See, e.g., Dziwanoski v. Ocean Carriers Corp.*, 26 F.R.D. 595, 596 (D. Md. 1960) (regarding plaintiff's request to have his attorney present at his IME); *McKitis v. Defazio*, 187 F.R.D. 225, 227-28 (D. Md. 1999) (concerns about examiner bias); *McKisset v. Brentwood BWI One LLC*, Civil Case No. WDQ-14-1159, 2015 WL 8041386, at *1 (D. Md. Dec. 4, 2015) (same); *Shipley v. Disney*, No. 21-cv-3173-SAG, 2024 WL 128778, at *1 (D. Md. Jan. 11, 2024) (same).

The United States, however, incorrectly assumes that the Court's lack of involvement, or Rule 35's silence as to restrictions, gives their expert unfettered power to conduct any type of examination he sees fit. This Court has acknowledged that inherent to Rule 35 is the idea that an IME "should be divested, as far as possible, of any adversary character. The physician is an 'officer of the Court' performing a non-adversary duty." *Dziwanoski*, 26 F.R.D. at 597. That duty is solely "to obtain medical data and information as to the plaintiff's condition." *Id.*

At issue here is whether Dr. Apostolo's interview of Ms. Woodall and his subsequent conclusions were related solely to the condition of Ms. Woodall's hand, or whether they went to standard of care and causation. In examining whether questions Rule 35 examiners ask are appropriate, courts have asked whether the questions are "within the customary bounds of a [medical] examination." *Ren v. Phoenix Satellite Television (US), Inc.*, 309 F.R.D. 34, 37 (D.D.C. 2015). Several courts have found, for example, that asking about a plaintiff's medical history is customary and permitted under Rule 35. *See, e.g., Tarte v. U.S.*, 249 F.R.D. 856, 860-61 (S.D. Fla. 2008); *Romano v. II Morrow, Inc.*, 173 F.R.D. 271, 273 (D. Or. 1997); *Hernstein v. Kimberly Home Health Care, Inc.*, 189 F.R.D. 620, 626 (D. Kan. 1999).

On the other hand, it is unusual for a doctor performing a Rule 35 examination to ask detailed questions about the controversy at the heart of a case. In a case where a plaintiff was injured in a traffic accident, for example, a court found it "highly unlikely that an examining physician would ask the plaintiff detailed questions concerning the accident. As a general rule, the doctors only ask the background questions needed to treat the patient such as whether the impact was from the front or the rear and the force of the impact." *Wheat v. Biesecker*, 125 F.R.D. 479, 480 (N.D. Ind. 1989). If a court determines after reviewing an IME report that there was improper questioning, the proper remedy is to exclude the evidence at trial. *Id.*

Dr. Apostolo's interview of Ms. Woodall went well beyond her medical history, in several regards, and thus fell outside the scope of a proper Rule 35 examination. First, Dr. Apostolo reviewed each hospital visit in detail with Ms. Woodall, focusing on Dr. Ligato and PA Gothard's actions, not the condition of Ms. Woodall's hand. He asked "detailed questions" about the controversy at the heart of the case—whether the medical care Ms. Woodall received was legally sufficient. For example, in asking Ms. Woodall about the July 6 and July 9 visits, he notes that "PA Gothard explained the potentially devastating effects of a post-operative infection" and "even went so far as to schedule a follow up . . . despite the notable improvement

already documented on July 6." ECF No. 44-2, at 6. In asking Ms. Woodall about her visit on July 23, he noted that she asked Dr. Ligato's permission to travel and that she "obviously would not have gone unless [Dr. Ligato] thought it was okay." *Id.* at 6-7; *see Wheat*, 125 F.R.D. at 480; *Flack v. Nutribullet*, L.L.C., 333 F.R.D. 508, 514 (C.D. Cal. 2019) ("[Q]uestions seeking information about how Plaintiff sustained her injuries – as opposed to what injuries resulted from the incident and how those injuries have affected Plaintiff's daily activities – are improper."). Second, he explicitly asked Ms. Woodall why she "limited her complaint to Dr. Ligato," delving into her legal strategy. *Id.* at 9. Third, Dr. Apostolo asked a series of questions that brought into question Ms. Woodall's memory. He questioned how she was able to see Dr. Ligato the same day she saw her primary care provider, where the precise location of the pain in her thumb was on June 11, 2021, whether Dr. Ligato performed a post-operative procedure on her open wound, whether she received a referral for therapy, and whether she spoke with Dr. Ligato between July 23rd and July 29th. ECF No. 44-2, at 4-7.

Dr. Apostolo used that line of impermissible questioning to make standard of care and causation conclusions that also exceed the scope of a Rule 35 examination. Dr. Apostolo concluded that he could not find

> a single instance of the care and advice provided to Ms. Woodall by any personnel associated with the United States of America, including Dr. Ligato, that did not make a reasonable decision based upon the generally accepted practice standards at the time, place and in the context of the care delivered.

*Id.* at 10 (quotation marks omitted); *see also id.* (finding that nothing that Dr. Ligato or the United States did "intentionally, with malfeasance, or with negligence caused or contributed to Ms. Woodall's two infections."); *id.* at 11, 13-14. In support of this conclusion, Dr. Apostolo found that:

- It was appropriate for Dr. Ligato to discard the plastic bag that contained purulence that Ms. Woodall provided. *Id.* at 11.

- Dr. Ligato acted reasonably by not culturing the wound three weeks after surgery and found her prescription of an antibiotic "laudable." *Id.*
- Dr. Ligato's "failure to explore for, or additionally treat, the unknown retained nylon suture material" was reasonable. *Id.* He concluded that Dr. Ligato acted appropriately, that she took "additional precaution," and that Ms. Woodall owes Dr. Ligato "a debt of gratitude" for the care she provided. *Id.* at 11, 13. He concluded that "this case is not demonstrably indicative of any malpractice action or inaction by Dr. Ligato and/or the United States of America." *Id.* at 13-14.

As an IME physician, it was inappropriate for Dr. Apostolo to draw those conclusions. Under Rule 35, Dr. Apostolo was an "officer of the Court," limited to "performing a non-adversary duty." *Dziwanoski*, 26 F.R.D. at 597; *see Peters v. Balt. City Bd. of Sch. Comm'rs*, No. WMN-13-3114, 2014 WL 4187307, at *7 (D. Md. Aug. 21, 2014) ("[E]xpert testimony as to legal conclusions is generally inadmissible.") (citing *Sun Yung Lee v. Clarendon*, 453 F. App'x 270, 278 (4th Cir. 2011)).

Additionally, Dr. Apostolo drew a series of impermissible conclusions as to Plaintiff's credibility. *See Gray v. State of Florida*, No. 3:06-cv-990-J-20MCR, 2007 WL 2225815, at *3 (M.D. Fla. July 31, 2007) ("[C]ourts have held expert testimony regarding the credibility of a witness or party inadmissible, finding such testimony an invasion of the jury's province."); *Zabkowicz v. West Bend Co.*, 585 F. Supp. 635, 636 (E.D. Wis. 1984) (expressing concerns about the impartiality of defendants' expert acting as the IME examiner). Dr. Apostolo opines that Ms. Woodall was under "significant stress" at the time and "seems to have sublimated her memory to the realm of poor recollection." ECF No. 44-2, at 13. He also concluded that Ms. Woodall is "a woman who knows how to get attention and treatment whenever, and wherever, she wants it," making character and credibility judgments. *Id.* at 12. His credibility

determinations are squarely the kind of testimony that courts have flagged as problematic. *See Gray*, 2007 WL 2225815, at *3.

The United States argues that just because Dr. Apostolo is its standard of care and causation expert does not disqualify him from conducting the IME. ECF No. 45, at 5; *McKisset*, 2015 WL 8041386, at *1; *Ren*, 309 F.R.D. at 36. This argument misses the point. While courts regularly allow experts to conduct IME examinations, they only do so absent evidence of impropriety. *McKisset*, 2015 WL 8041386, at *4 (denying plaintiff's request that her medical expert and a court reporter be present at her IME because she gave "no concrete proof of Dr. Schretlen's partiality, other than that he has been hired by [defendant] to perform the examination"); *Holland v. U.S.*, 182 F.R.D. 493, 494-95 (D.S.C. 1998) (allowing defendant's expert to conduct the IME examination because there was "no evidence of personal bias"). Here, where Dr. Apostolo has eroded the boundary between his job as an expert and his responsibility as a medical examiner—i.e., an impartial "officer of the Court," he has already exceeded the limits of Rule 35. *See Dziwanoski*, 26 F.R.D. at 597.

**II. Dr. Apostolo's Conduct Additionally Violated Maryland Rule of Professional Conduct 4.2.**

Ms. Woodall additionally argues that Dr. Apostolo's conduct violates Maryland Rule of Professional Conduct 4.2, which provides that an attorney or the attorney's agent "shall not communicate about the subject of the representation with a person who the attorney knows is represented in the matter by any other attorney unless the attorney has the consent of the other attorney or is authorized by law or court order to do so."

Dr. Apostolo's questioning, which, as discussed, went beyond the limits of a Rule 35 medical examination, constitutes a clear violation of Maryland Rule of Professional Conduct 4.2. The United States' counsel had a responsibility to prevent their retained expert's improper examination of Ms. Woodall without her counsel's consent. *See Levy v. Green, et al.*, 8:18-cv-01291-TDC, 2024 WL 3090367, at *7 (D. Md. June 21, 2024); ABA Comm. on Ethics & Pro.

Resp., Formal Op. 95-396, at 2, 18-19 (1995); *Brown & Sturm v. Frederick Rd. Ltd.*, 768 A.2d 62, 78 (Md. Ct. Spec. App. 2001) ("Maryland has . . . substantially adopted the ABA Model Rules into the Maryland Rules of Professional Conduct, . . . and the ABA's opinions regarding the Model Rules, though not binding, are highly persuasive authority in Maryland courts." (internal citation omitted) (citing *Att'y Grievance Comm'n v. Gregory*, 536 A.2d 646, 651 (Md. 1988))). Numerous decisions from other courts have found that lawyers violated analogous rules prohibiting *ex parte* communications where their retained experts interviewed represented parties without consent. *See, e.g., Coleman v. Brown*, 938 F. Supp. 2d 955, 963-66, 968 (E.D. Cal. 2013); *United States v. Sierra Pac. Indus.*, 857 F. Supp. 2d 975, 977-79, 984 (E.D. Cal. 2011); *Awan v. Awan*, 906 N.Y.S.2d 70, 72 (Sup. Ct. 2010); *Louhisdon*, 2001 WL 360047, at *1, *4; *In re Katrina W.*, 37 Cal. Rptr. 2d 7, 9-11 (Ct. App. 1994).

**III. Remedies**

Ms. Woodall asks the Court to exclude Dr. Apostolo's report in its entirety and strike him from acting as Defendant's standard of care, causation, and damages expert in this matter. ECF No. 44 at 4, 17-18. The United States, in turn, argues that the appropriate remedy is to allow Ms. Woodall to depose or cross-examine Dr. Apostolo, or to exclude only parts of the report that the Court deems inappropriate. ECF No. 45, at 10-11.

The Court will not exclude Dr. Apostolo's IME report in its entirety. Ms. Woodall relies on the holding in *Levy* to argue that this Court should exclude the entire report. However, the circumstances of *Levy* are distinguishable. In *Levy*, the parties agreed to an IME by one physician, but a second physician conducted a second unauthorized examination. 2024 WL 3090367, at *2. Excluding the second unauthorized report in its entirety was the appropriate remedy because the report itself was outside the scope of Rule 35. *Id.* at *8. Here, Ms. Woodall consented to Dr. Apostolo conducting the IME, and while parts of the report are improper, others are squarely within the scope of a Rule 35 examination. *See* ECF No. 44, at 7. For

example, Dr. Apostolo's discussion of Ms. Woodall's past medical history is perfectly appropriate. *See Tarte*, 249 F.R.D. at 860-61 (holding that questions about a plaintiff's medical history are a customary part of an IME). Additionally, his discussion of Ms. Woodall's current functionality and the physical examination he conducted on her hand is within the scope of a Rule 35 examination. *See* ECF No. 44-2, at 8-9. This Court has held that when a doctor asks questions outside the scope of Rule 35, the "practical and reasonable solution to the question" is "to exclude from evidence any statements made by the plaintiff to the doctor relating to non-medical matters. Such an exclusion would constitute a protection to the plaintiff against any admission which might affect [her] rights." *Dziwanoski*, 26 F.R.D. at 598.

However, the Court agrees with Ms. Woodall that it would be unfair to allow Dr. Apostolo to testify as the United States' standard of care and causation expert because he cannot "unlearn the information he gained, impressions he formed, and conclusions he drew from his unauthorized [IME questioning]." *Levy*, 2024 WL 3090367, at *11. Accordingly, the Court will allow Dr. Apostolo to testify only to the remaining conclusions in his IME report, with clear instructions and limitations. *See Joaquim v. Buzzuro*, Civil No. 1:22-0050-CDA, 2024 WL 3936925, at *12 (D. Md. Aug. 26, 2024) (discussing limitations courts imposed on expert witnesses to avoid impermissible legal conclusions). Dr. Apostolo may not testify as to whether the United States was negligent or whether its treatment of Ms. Woodall constituted malpractice. He cannot testify as to his opinion of Ms. Woodall's credibility. He may, however, testify about Ms. Woodall's medical history, relevant details of her past medical visits, the current condition of her hand, his examination of her thumb, and his medical opinions regarding those topics. *See generally* ECF No. 44-2.

Because the appropriate parts of Dr. Apostolo's report can be segregated, the Court will exclude only the parts that exceed the scope of Rule 35. However, because no other remedy can "place [Ms. Woodall] in the same position [she] would have been in" had the unauthorized

questioning never occurred, *Louhisdon*, 2001 WL 360047, at *4, the Court will exercise its inherent authority to limit Dr. Apostolo's testimony to what remains of the IME report after this Court's redactions.

**CONCLUSION**

For the foregoing reasons, this Court grants in part and denies in part Ms. Woodall's Motion to Exclude Dr. Apostolo's Rule 35 report. ECF No. 44. The Court denies Ms. Woodall's Motion to Strike Dr. Apostolo as an expert, but places limitations on the scope of his future testimony in this case. *Id.*

So ordered.

Date: November 20, 2026

_________/s/_____________
Ajmel A. Quereshi
U.S. Magistrate Judge